# AKIN GUMP
# STRAUSS HAUER & FELD LLP

━━━━━━━━━━ Attorneys at Law

JAMES J. BENJAMIN, Jr.
212.872.8091/fax: 1.212.872.1002
jbenjamin@akingump.com

November 4, 2011

BY HAND (redacted version filed via ECF)

The Honorable Denise Cote
United States District Judge, Southern District of New York
500 Pearl Street, Room 15B
New York, New York 10007

> Re:    *United States v. Joseph F. Skowron III, a/k/a "Chip Skowron"*
> 11 Cr. 699 (DLC)

Dear Judge Cote:

On behalf of our client, Joseph F. "Chip" Skowron III, we respectfully submit this letter in connection with his sentencing, which is scheduled for November 18, 2011.

## PRELIMINARY STATEMENT

Dr. Skowron stands before this Court having accepted responsibility for a serious crime that reflects a profound lapse in judgment. His criminal conduct has caused irreparable harm to his own life, which in other respects has been filled with distinction, achievement, and success. Most painfully for him, his criminal conduct has also caused enormous suffering and hardship for his beloved wife and four precious children—all of whose lives have been unalterably disrupted despite the fact that they are blameless. Others whom he cares about, including his former colleagues at FrontPoint Partners, have also been harmed by his acts. Dr. Skowron accepts responsibility for his conduct, recognizes the inevitability of punishment, and will forever regret the poor choices that caused pain and dislocation for others and that have led him to this crossroads in his life. He has already paid a high price for his poor choices, and he recognizes that additional consequences are still to come.

But Dr. Skowron is a hopeful man. Anchored by his strong Christian faith and with the freedom of conscience that comes from having accepted responsibility for his acts, he looks forward with humility to the next chapters of his life. He stands before this Court as a person who is undeniably flawed but who also has demonstrated, through his actions over many years, that he has a tremendous capacity for good works and positive contributions to society. He is deeply committed to his family and his faith. His top priority in the current crisis is to avoid further harm to his family. It is our hope that through this submission, the Court is able to gain a fuller understanding of Dr. Skowron's character, background, and life circumstances so that it can impose a sentence that is just under all of the circumstances.

AKIN GUMP
STRAUSS HAUER & FELD LLP
Attorneys at Law

Honorable Denise Cote
November 4, 2011
Page 2

In preparing this submission, we have been aided greatly by an outpouring of supportive letters from Dr. Skowron's family and friends.  Drawing heavily on those letters, we begin with a discussion of Dr. Skowron's background and personal history.  We next discuss his criminal conduct and its ramifications, his acceptance of responsibility, and the pending global settlements in the parallel SEC enforcement case.  We then address the three pillars of Dr. Skowron's life: family and friends, service to others, and his Christian faith.  Finally, after describing the tremendous consequences that Dr. Skowron has suffered to date and the exposures that he is currently facing, we finish with a brief discussion of certain elements of his sentence.

## FACTUAL BACKGROUND

### Personal History

As Dr. Skowron's wife Cheryl describes him, "He's had nothing handed to him.  He's successful because he's exceptionally smart and works extraordinarily hard.  Chip is a self made man."  (Ex. 29 at 5).

*Childhood and Education*

Chip Skowron was born in 1969 and grew up in the small town of Cocoa, Florida.  As a child, he thrived within his "close knit" and supportive family—his mother in particular "showered him with her love."  (PSR ¶ 65; Ex. 30 at 2).  His father Joseph worked as an engineering supervisor at the Kennedy Space Center for nineteen years and then became a restaurateur, while his mother was an educator for thirty years.  (PSR ¶ 64; Ex. 30 at 1).  Dr. Skowron has two siblings, an older sister Cindi and a younger sister Jodie.  (PSR ¶ 63).  His sister Cindi describes the family as being composed "of 'Type A' personalities, very driven, highly energetic and quite competitive."  (PSR ¶ 79).  Chip excelled in school and sports, particularly tennis and soccer.  (Ex. 30 at 2).  His parents were proud role models for their son, who "raised [Chip] according to Christian principles."  (Ex. 30 at 2).  Chip's work ethic and commitment to academic excellence resulted in his graduating second in his high school class. (Ex. 30 at 2).[1]

After graduating from high school, Chip went on to attend Vanderbilt University.  (PSR ¶ 66).  While there he studied math and chemistry and aspired to become a doctor, as his mother

A K I N   G U M P
S T R A U S S   H A U E R   &   F E L D LLP
Attorneys at Law

Honorable Denise Cote
November 4, 2011
Page 3

had always "encouraged him to study medicine." (PSR ¶¶ 65, 99). In his senior year, he "was offered the opportunity to attend a dual medical program at Yale University" on a full scholarship. (PSR ¶ 66; Ex. 14 at 3). This unique and highly selective program would allow him to earn both a medical degree and a Ph.D. (PSR ¶ 66).

This moment of great academic triumph was accompanied by devastating personal tragedy. As his sister Cindi recounts, Chip was unable to share the news of his acceptance with his mother. Cindi recalled that, "Within 30 minutes of Chip's message on our parents' answering machine sharing the just received news of his invitation to Yale's fully paid MD/PHD scholarship program, our father returned his call to convey the shocking account of our mother's death hours earlier" in a car crash at age 52. (Ex. 14 at 3).

By all accounts, Dr. Skowron was "dramatically affected" by the death of his mother, with whom he shared such a close relationship. (Ex. 14 at 3). His father remarked that it was "a most traumatic period for Chip." (Ex. 30 at 3). His sister Cindi recalled that Chip had trouble dealing with his mother's death, noting that he had "spent very little time grieving with the family," and "appeared angry and unprepared to emotionally expose his grief." (PSR ¶ 83).

The autumn after his mother's death, Chip moved to Connecticut to begin his studies at Yale. (PSR ¶ 66). While there he met his future wife, Cheryl Birdsall, who was working as a copywriter for an advertising agency in Manhattan. (PSR ¶ 67). Chip and Cheryl married in Connecticut in 1996. (PSR ¶ 67). In 1998, after seven years of education and training, Dr. Skowron graduated from Yale University with a Masters Degree in Science, a medical degree, and a Doctorate in Molecular and Cellular Biology. (Ex. 30 at 3).

*Medical Career*

Dr. Skowron continued to achieve at the very highest level after completing his studies at Yale. He was accepted into Harvard's Intern and Residency Program, during which he served for one year as a general surgery intern and for two years as an orthopedic surgery resident. (Ex. 30 at 3). During this period, while on a resident's salary and budget, Dr. Skowron demonstrated the commitment to charitable works that would be a hallmark of his life. Throughout his tenure at Harvard, he saved his allotted vacation days for use on relief missions with AmeriCares, a wonderful organization with which he had become increasingly involved. (Ex. 18 at 8). (We provide more detail about AmeriCares, and Dr. Skowron's longtime commitment to the organization, *infra*). While juggling family life and his work as a surgeon, he still found a way to volunteer his time and medical expertise by participating in humanitarian aid missions all over the world. (Ex. 18 at 4).

AKIN GUMP
STRAUSS HAUER & FELD LLP
––––––––– Attorneys at Law

Honorable Denise Cote
November 4, 2011
Page 4

The tension between career and family emerged as a real concern for Dr. Skowron during his medical training. One Easter Sunday, he made the decision that he had been grappling with for some time—to leave medicine. (Ex. 30 at 4). He called his father and said he did not want to continue in a profession where many of his more senior colleagues were no longer married to their first wives and that had required him to miss his daughter's first Easter because he was on call at the hospital. (Ex. 30 at 4).

*Investment Career*

After a period of reflection, Dr. Skowron believed that he was well positioned to pursue a career as a healthcare investment professional because of his extensive knowledge of medicine and cellular biology. He pursued this new career with the same passion and drive that he had shown in the pursuit of his medical career.

Dr. Skowron began his career as a financial analyst with brief stints at two different hedge fund managers. In 2003, he joined forces with two colleagues to launch a hedge fund focused on healthcare stocks under the auspices of FrontPoint Partners, a fund management company based in Connecticut. (PSR ¶¶ 105–106). Over time, the FrontPoint Healthcare funds grew in size. As outlined below, however, the Healthcare funds were liquidated in late 2010, and assets were returned to investors, within weeks after the initial arrest in this investigation. The demise of the FrontPoint Healthcare business, and the attendant dislocation suffered by many of his former colleagues, is a matter of great regret for Dr. Skowron, who cares about his former colleagues and devoted years of his life to building and nurturing the business along with them.

Growing the FrontPoint Healthcare business required long hours and extensive travel, but throughout this time Dr. Skowron worked hard to balance his personal, philanthropic, and professional lives. His brother-in-law's brother, Matthew Judice, remembered being "very impressed" that Dr. Skowron took his oldest daughter K███ with him on a business trip to India that coincided with an AmeriCares event there. (Ex. 11 at 6). On the trip, Dr. Skowron made sure K███ kept a journal about her experiences, and "went out of his way to show her the poverty that exists and how she should make time in her life to help those in need." (Ex. 11 at 6).

Dr. Skowron's former co-worker at FrontPoint, Jay Coyle, similarly recalled that during Dr. Skowron's tenure at the company, he consistently "spent more time working outside of his primary career on charity endeavors" than anyone else he had ever met. (Ex. 6 at 2). Coyle stated that Dr. Skowron's tireless commitment to raising money for charity—particularly for AmeriCares—required him to send many fundraising appeals to his colleagues and friends in the financial world over the years. (Ex. 6 at 2). Coyle said that being a major fundraiser for

AKIN GUMP
STRAUSS HAUER & FELD LLP
—————— Attorneys at Law

Honorable Denise Cote
November 4, 2011
Page 5

AmeriCares meant that Dr. Skowron had to "go back to the people he needed to lean on for his [financial] career and ask them for their generous support time and time again. I don't think this helped Chip's standing in the financial community, I think this was a doctor helping people who were truly in need in the best way he thought he could." (Ex. 6 at 2).

The heights that Dr. Skowron attained academically, in his medical training, and during his days in the hedge fund industry have now been vaporized—in a brutal and public fashion—as a result of his own misconduct. In the next section of this submission, we discuss that conduct, its consequences, and Dr. Skowron's acceptance of responsibility for his wrongdoing.

**Dr. Skowron's Criminal Conduct**

Dr. Skowron's criminal conduct arose out of his work as a co-portfolio manager for the FrontPoint Healthcare hedge funds. (PSR ¶ 8). FrontPoint was set up as a hedge fund management company with a variety of different funds and strategies. With his two partners, Dr. Skowron was responsible for making investment decisions with respect to FrontPoint's Healthcare funds. He had no responsibility for investing on behalf of any other FrontPoint funds.

At all relevant times, FrontPoint had a business relationship with an expert networking service (defined in the PSR as the "Expert Networking Firm") under which FrontPoint compensated the Expert Networking Firm annually for access to its stable of expert consultants. As a part of this arrangement, Dr. Skowron was introduced to a consultant named Dr. Yves Benhamou. (PSR ¶ 9). Dr. Benhamou is an expert in the treatment of hepatitis C, and was viewed by Dr. Skowron as a "thought leader" in the hepatitis research field. (PSR ¶ 9).

In late 2007, among their investments, the FrontPoint Healthcare funds had a substantial long position in stock issued by Human Genome Sciences, Inc. ("HGSI"). (PSR ¶ 11). Dr. Skowron had primary responsibility for the funds' HGSI investment, which was predicated on a bullish view of a HGSI developmental drug called Albuferon, which was designed to treat hepatitis C. Dr. Skowron consulted with Dr. Benhamou about Albuferon and other developments in the hepatitis space.

In 2007 and 2008, Dr. Benhamou was involved in the clinical drug trials of Albuferon, and was under an obligation not to reveal any confidential information about the trials. (PSR ¶ 13). In December 2007 and January 2008, he nevertheless disclosed material, nonpublic information about negative developments in the Albuferon Phase 3 drug trial to Dr. Skowron. (PSR ¶¶ 20–24). Dr. Skowron used this inside information as the basis for sales of the HGSI

AKIN GUMP
STRAUSS HAUER & FELD LLP
—————— Attorneys at Law

Honorable Denise Cote
November 4, 2011
Page 6


stock owned by the FrontPoint Healthcare funds, thereby avoiding losses of approximately $30 million for the funds.  (PSR ¶ 13).

All of the unlawful trading was carried out through the FrontPoint Healthcare funds; Dr. Skowron did not engage in any personal sales of HGSI based on inside information. Accordingly, all of the $30 million in avoided loss redounded to the benefit of the FrontPoint Healthcare funds; none of it went directly to Dr. Skowron or any other individual.[2]

The U.S. Securities and Exchange Commission ("SEC") began investigating FrontPoint's HGSI transactions in February 2008.  (PSR ¶ 29).  During the ensuing investigation, Dr. Skowron and Dr. Benhamou agreed to provide the investigators with a false story to obscure the fact that Dr. Benhamou had disclosed inside information.  (PSR ¶ 30).  In furtherance of the obstruction conspiracy, Dr. Skowron offered Dr. Benhamou cash after the SEC investigation had begun and testified falsely in his SEC deposition in the summer of 2009.  (*See* PSR ¶¶ 31–34).

On November 2, 2010, Dr. Benhamou was arrested by the FBI while visiting the United States for a medical conference in Boston.  At the same time, the SEC filed a civil enforcement case against him in the Southern District of New York.  *SEC v. Benhamou*, No. 10 Civ. 8266 (DAB).  Although the civil and criminal complaints against Dr. Benhamou did not identify Dr. Skowron or FrontPoint by name, the media immediately made the connection and publicly linked Dr. Skowron to the allegations against Dr. Benhamou.  Dr. Skowron was immediately put on administrative leave by FrontPoint and was later terminated.  Soon after Dr. Benhamou's arrest, FrontPoint announced that it had decided to wind down and liquidate the Healthcare funds and return the assets to investors.  A number of Dr. Skowron's former colleagues lost their jobs and had their lives disrupted as a result of the demise of the FrontPoint Healthcare business.

During the period after Dr. Benhamou's arrest, Dr. Skowron devoted most of his energy to protecting his family from the media onslaught to the best of his ability and spending as much time as possible with his wife, four young children, and extended family.  He also provided volunteer services to a network of free clinics offering healthcare to disadvantaged residents of

---

[2] Despite this important fact, it may be useful for the Court to consider the portion of the avoided loss that could hypothetically be attributed to Dr. Skowron based on his status as a (relatively small) investor in the FrontPoint Healthcare funds and his entitlement to receive a (relatively small) portion of the management and incentive fees associated with the FrontPoint Healthcare funds.  Such a calculation is inherently imprecise and rests on assumptions that are unfavorable to Dr. Skowron, who, we emphasize, did not directly receive anything as a result of the illegal trades.  Nevertheless, if all relevant assumptions are made against Dr. Skowron, the maximum personal avoided loss that could hypothetically be attributed to him as a result of the improper trading in this case is approximately $1.36 million.

A K I N   G U M P
S T R A U S S   H A U E R   &   F E L D LLP
━━━━━━━━ Attorneys at Law

Honorable Denise Cote
November 4, 2011
Page 7


Connecticut. Finally, during this time of intense personal crisis, Dr. Skowron drew support and guidance from clergy and faith-based community groups.

In April 2011, Dr. Skowron learned that the U.S. Attorney's Office intended to charge him criminally. He voluntarily surrendered to authorities on April 13, 2011, and was charged by criminal complaint with, among other things, conspiring to violate the securities laws and conspiring to obstruct justice. At the same time, Dr. Skowron was also sued by the SEC in the Southern District of New York. In the criminal case he was released on bail and in the words of Pretrial Services has been "extremely compliant" with all conditions of release. (PSR ¶ 6).

## Resolution of the Criminal and Civil Charges Against Dr. Skowron

### Dr. Skowron's Guilty Plea

Soon after his arrest, Dr. Skowron initiated pre-indictment plea discussions with the government. On August 15, 2011, he pleaded guilty to a one-count information charging him with conspiracy to commit securities fraud and to obstruct justice in violation of Title 18, United States Code, Section 371.

In his plea agreement, Dr. Skowron stipulated to sentencing guidelines calculations yielding a range of 87–108 months and a Stipulated Guidelines Sentence of 60 months' imprisonment, which is the statutory maximum for the offense of conviction. Dr. Skowron agreed not to seek a sentence other than the Stipulated Guidelines Sentence. In the plea agreement, he admitted the forfeiture allegations in the information and consented to the entry of a Consent Order of Forfeiture under which he will forfeit $5 million to the government in full satisfaction of the forfeiture allegation.

### Global Settlement of the SEC Enforcement Case

The SEC brought a parallel civil enforcement action against Dr. Skowron, the six FrontPoint Healthcare funds that engaged in the illegal sales of HGSI stock in December 2007 and January 2008 and realized improper benefits therefrom, and Dr. Benhamou. *See SEC v. Skowron et al.*, No. 10 Civ. 8266 (DAB). All defendants in the SEC case (including the FrontPoint Healthcare funds, which were named only as "relief defendants") have now reached settlements with the SEC. The settlements, which are described below, are pending before the Honorable Deborah A. Batts.

Because the resolution of the SEC action is relevant to Dr. Skowron's sentencing in a variety of ways, we provide a brief summary of the allegations and the various settlements.

AKIN GUMP
STRAUSS HAUER & FELD LLP
—————— Attorneys at Law

Honorable Denise Cote
November 4, 2011
Page 8


A.  SEC complaint and amended complaint

On November 2, 2011, the SEC filed its original complaint, which named only Dr. Benhamou as a defendant.  On April 13, 2011, the date on which Dr. Skowron voluntarily surrendered to face the criminal charges filed against him, the SEC filed an amended civil complaint which added Dr. Skowron as a defendant and six FrontPoint Healthcare funds as relief defendants.  The amended complaint alleged substantially the conduct set forth in the criminal charge against Dr. Skowron.

The SEC's amended complaint sought a variety of remedies.  With respect to Dr. Skowron and Dr. Benhamou, the amended complaint sought disgorgement, civil penalties, and injunctive relief.  With respect to the six FrontPoint Healthcare funds, the SEC sought a judgment "ordering the Relief Defendants, as constructive trustees of illegally-obtained funds resulting from Defendants' above-described conduct, to return those funds as to which they have no legitimate claim, with prejudgment interest."  *SEC v. Skowron et al.*, Amended Complaint at 34 (Apr. 13, 2011).

B.  Settlement by the six FrontPoint Healthcare funds

On or around April 13, 2011, the SEC reached a settlement with the six FrontPoint Healthcare funds that engaged in the illegal sales of HGSI stock and that, accordingly, received the benefit of the unlawful trades.  Pursuant to that settlement, the FrontPoint funds agreed to disgorge $29,017,156.00, plus prejudgment interest thereon in the amount of $4,003,669.00, for a total sum of $33,020,825.  U.S. Securities and Exchange Commission Litigation Release No. 21928 (April 13, 2011), available at www.sec.gov/litigation/litreleases/2011/lr21928.htm.  We understand that the FrontPoint funds have placed the sum of $33,020,825 in escrow, and that the money remains in escrow pending approval of the settlement by Judge Batts.

We have been advised by the SEC staff that the SEC has approved a "Fair Funds" procedure for the distribution of funds recovered by the SEC (including the $33 million in escrowed funds) to investors who were injured by the unlawful sale of HGSI stock by the FrontPoint Healthcare funds.  *See* 15 U.S.C. § 7246.  It is our understanding that the SEC staff is currently in the process of soliciting bids from distribution agents to administer the Fair Funds process.  We further understand from the SEC staff that once a distribution agent has been selected and Judge Batts has approved the pending settlements, the SEC will submit a plan for approval to Judge Batts and that, pursuant to the plan, the distribution agent will implement a procedure for disbursing the funds to injured investors.  We have been advised that this process is expected to take approximately 12 to 18 months once a plan has been approved.

AKIN GUMP
STRAUSS HAUER & FELD LLP
━━━━━━━━━━ Attorneys at Law

Honorable Denise Cote
November 4, 2011
Page 9


C.  Settlement by Dr. Skowron

At the time of his guilty plea in August 2011, Dr. Skowron simultaneously reached a settlement with the SEC that provides for various forms of relief against him. *First*, Dr. Skowron agreed to pay to the SEC a civil penalty of $2.7 million pursuant to § 21A of the Securities Exchange Act of 1934, 15 U.S.C. § 78u-1. In August 2011, Dr. Skowron placed the $2.7 million in escrow pending approval of the SEC settlement. Those funds will be disbursed to the SEC upon approval of the settlement by Judge Batts. We understand from the SEC staff that the $2.7 million will be available to be paid out to injured investors pursuant to the Fair Funds process as a supplement to the $33 million in escrowed monies described above, in conformity with 15 U.S.C. § 7246. *Second*, Dr. Skowron's disgorgement obligation will be fully satisfied and offset by other sums paid pursuant to the resolutions of the SEC and criminal cases. *Third*, Dr. Skowron has consented to an injunction against any future violations of the securities laws. *Fourth*, Dr. Skowron has consented to the entry of a lifetime industry bar in a separate administrative proceeding.

D.  Settlement by Dr. Benhamou

We understand that Dr. Benhamou also separately settled with the SEC and that his settlement is pending before Judge Batts along with those of Dr. Skowron and the FrontPoint Healthcare funds. We are not aware of the details of Dr. Benhamou's settlement.

*Dr. Skowron's Sincere and Genuine Acceptance of Responsibility*

Although Dr. Skowron's guilty plea and SEC settlement are clearly sufficient to establish that he has accepted responsibility for his wrongdoing under the Guidelines, *see* U.S.S.G. § 3E1.1, we nevertheless wish to highlight the depth and sincerity of his acceptance of responsibility, which in the experience of undersigned counsel is quite extraordinary.

Dr. Skowron spent the months after Dr. Benhamou's arrest reflecting on his mistakes and telling those closest to him how deeply he regrets his actions. "Chip is contrite, repentant and heartily sorry for his action associated with the sale of a biopharmaceutical company's stock with non-public information in 2008." (Ex. 19 at 2). As his friend Don Carlson describes:

> Chip has gotten the message and seen the grave mistakes he has made in his life choices. We have had many long conversations through the devastating events of the past year and more; he is always the first to say that he knows he lost his way by chasing the empty gods of ego and money and status in a world that was painfully far removed from the richer, more meaningful world of medicine that he (unwisely) left behind. The pot of gold at the end of the hedge fund rainbow

AKIN GUMP
STRAUSS HAUER & FELD LLP
Attorneys at Law

Honorable Denise Cote
November 4, 2011
Page 10

tempted Chip away from the work he loved best, and he now lives to regret that choice every day of his life.

(Ex. 5 at 7). Ordained minister David Miller has known Dr. Skowron for several years through their involvement in various faith-based organizations. Reverend Miller comments that:

> Over the years, I have seen and counseled several individuals who have crossed the line, and found their lives shattered when their actions came to light. Some of those people remain in denial, offering fake apologies and feigned repentance. . . . Chip is not one of [] those who offer insincere apologies; he is deeply repentant of his wrong actions and their ramifications, and is a changed man who will never again breach society's trust.

(Ex. 22 at 4–5). Even Dr. Skowron's older sister, whose strained relationship with him prior to 2008 left her more critical of him than most, said that:

> I believe Chip is truly remorseful for his actions and I am excited for his future as his desires, energy and focus on others will surely move society to a better place once his restitution is complete. I am able to say this because of Chip's track record with his previous endeavors, whether it was performing orthopedic surgery, engaging in scientific research or creating a hedge fund—the results were truly amazing. God has blessed Chip mightily and I am anxious to see how this *new man* will use his God-given talents to God's glory rather than man's.

(Ex. 14 at 7). Another friend notes that Dr. Skowron is "accepting of his actions and willing to take responsibility for them. I admire that." (Ex. 1 at 7).

As the attached letters make clear, Dr. Skowron has already begun to live out his new life. Since Dr. Benhamou's arrest, he has sought counseling for his marriage and turned to the community for religious support. His outlook on life is evident even to those who have come to know him only recently:

> I am amazed that he is so focused on repenting and repairing the lives of those he harmed and his own. After reading the newspapers, I was expecting to see him sour and angry. He wasn't. . . . He openly confessed his failure in front of 100 men at Rockefeller Center during a morning meeting. There wasn't a dry eye in the room. It was sobering to see executives with emotions and a conscience. . . . Following the plea of guilty, Chip asked us to have breakfast with his family including Cheryl. He thanked us for being there to support him and his family. He then went around the table and shared how each person had affected his life

AKIN GUMP
STRAUSS HAUER & FELD LLP
Attorneys at Law

Honorable Denise Cote
November 4, 2011
Page 11

        since his failure.  He identified specific examples of how each man had shown
        him love during a very crucial time in his life.

(Ex. 20 at 7, 9).

        "None of the irony or pathos of this sad chapter of his life is lost on him.  If there is one
small silver lining to this thundercloud, it is that Chip is back on track with his life's purpose.  He
is completely and unequivocally committed to living out the rest of his days putting his
remarkable skills to work to heal the sick and wounded." (Ex. 5 at 5).  Dr. Skowron, whose
ability to travel is now restricted, has regularly volunteered in Connecticut clinics run by
AmeriCares. (PSR ¶ 109; Ex. 19 at 2).  His friend and former FrontPoint co-worker, Jay Coyle,
reiterates that, "I truly hope you can see that what this man has done in the past with his time and
his new commitment to what life is really all about suggest he will be a wonderful asset to the
charity and care for others that define what is great about humanity." (Ex. 6 at 4).

        As Dr. Skowron's stepmother noted in her letter to this Court, "It had to be the most
difficult day of his life to stand in front of you and admit his guilt to the world.  It was difficult to
tell his family and to face the world was monumental." (Ex. 31 at 4).  Friend Curt Welling
echoes this sentiment, saying that, "the series of wrong turns that led him to his current
circumstances have illuminated for him, in quite a profound way, what is the purpose of his life.
I believe he has tremendous clarity about what he did, what he is accountable for and the
appropriateness of his imminent punishment." (Ex. 35 at 3).

        Neighbor and friend Michael Behringer said, "Chip is a good man.  He is doctor.  A
humanitarian.  A good father.  A great neighbor.  And a loyal friend.  As long as I have known
him, he has tried to do right by others and give back to the community." (Ex. 1 at 8).  The
Skowron family and the Reiss family met as neighbors in Connecticut and have raised their
children together.  Mrs. Reiss said of the situation that, "I have known Chip for nearly a decade
and believe that—as we teach our children, sometimes good people do bad things but that does
not make them a bad person—he is a very good person who made a regrettable mistake." (Ex.
26 at 1).

        All of Dr. Skowron's loved ones know that what he did was wrong and that he will be
punished; however, they stress that this incident was profoundly out of character and will never
be repeated.  His wife Cheryl said, "I understand his lapse in judgment is significant.  He has
accepted full responsibility and is desperately sorry.  I'll forgive him; I'm working on it.  Take it
from me, aside from this one time mistake, Chip's character is rock solid." (Ex. 29 at 14).

A K I N   G U M P
S T R A U S S   H A U E R   &   F E L D LLP
━━━━━━━━━━━ Attorneys at Law

Honorable Denise Cote
November 4, 2011
Page 12

### Family, Friends, Service, and Faith

As the letters submitted to the Court make clear, the three pillars of Dr. Skowron's life have been family and friends, service to others, and his religious faith. We briefly address each of these topics below.

*Dr. Skowron's Commitment to His Family*

Dr. Skowron is deeply committed to his wife Cheryl, who has been grievously hurt by the fallout from her husband's acts. (Ex. 29 at 4). The couple met in 1993 and dated for three years before marrying in 1996. As Dr. Skowron's sister Jodie describes, "one of the best choices Chip ever made was to ask Cheryl Birdsall to marry him. As I have observed them over the years, it seems they are each other's perfect complement." (Ex. 4 at 2). Cheryl was a writer for an advertising agency in New York when she first met Dr. Skowron, who was a Yale medical student at the time. (Ex. 29 at 2; PSR ¶ 67). Cheryl decided to become a stay-at-home mother after giving birth to their third child. (PSR ¶ 67). Cheryl and Chip Skowron now have four young children all under the age of 13. (PSR ¶ 67). By all accounts, Cheryl is an amazing wife and mother—an "exceptionally genuine and generous person" who is completely devoted to her family. (Ex. 25 at 7).

While the couple has had their "share of ups and downs" over the years, they remain steadfast in their devotion to each other, particularly through what Cheryl describes as this "extraordinarily difficult time" in their relationship. (Ex. 29 at 7). Dr. Skowron's arrest and impending incarceration have placed an enormous strain on Cheryl in particular, as she is "sick with concern and sadness" that her family will have to live without their "rock." (Ex. 29 at 4). She is still coming to terms with the daunting prospect of raising four children without her husband. (Ex. 29 at 16). The legal and financial burdens confronting the Skowron family are quite destabilizing—this is a constant source of worry for Cheryl, who will have to navigate this upheaval alone. Through all of this, however, she maintains that it is "an honor and a pleasure to be Chip's wife." (Ex. 29 at 7).

As Cheryl describes, the consequences of the investigation and prosecution of her husband have already caused a "year of distress," and she finds herself unprepared and overwhelmed by what is in store for her. (Ex. 29 at 15; PSR ¶ 76). Her friends and loved ones have noticed the toll the past year has taken on her. One of the family's spiritual advisors, Pastor Lillis, who has "seen firsthand the extraordinary strain that this whole mess has caused in the Skowron household," calls the strain on Cheryl "profound and visceral." (Ex. 16 at 4).

A K I N  G U M P
S T R A U S S  H A U E R  &  F E L D LLP
━━━━━━━━━━ Attorneys at Law

Honorable Denise Cote
November 4, 2011
Page 13


Even though Cheryl fears how she and her husband will survive this ordeal, the source of her most profound concern is the effect on the four Skowron children: K███ age 12; C████ age 10; B███ age 7; and J████, age 5. Family friends describe the children as "reflections of [their father's] character and familial devotion. They are unspoiled, respectful, responsible, responsive, engaged and engaging." (Ex. 25 at 7). Cheryl notes that even when Dr. Skowron was traveling for business, "he always made up for lost time" with the children by making an effort to spend quality time with them, whether it was driving them to school or picking them up from practice. In the past year, Dr. Skowron has often prepared breakfast for his children, during which time "he reads *Streams in the Desert* (a daily devotional) to them and discusses how the message is expressed in their lives." (Ex. 9 at 6). Family friends of the Skowrons describe the level of involvement Dr. Skowron has with his children:

> He attends all four of his children's activities including soccer games, piano recitals, dance performances and school events. He helps the kids with their homework and supports them each on their current endeavors. Whether it is posting a sticker on the door "Ask an interesting question today!" or a similar message he writes on a note in their lunch, his positive influence is a constant in their lives.

(Ex. 9 at 6). Michael Behringer and his family lived next door to the Skowrons for four years, and Mr. Behringer said that he "always admired and emulated [Dr. Skowron's] parenting skills. He has raised four wonderful children. They are caring children with strong character—the type you want your children to play with and emulate. I attribute that to Chip's parenting. He is a strong influence in their lives, and has helped shape them into wonderful and compassionate children. He is the centerpiece of their lives, and their family." (Ex. 1 at 6). Some of Dr. Skowron's friends believe that losing his mother at a young age allowed him to appreciate the value of his own family, and cherish the time he is able to spend with his children. (Ex. 13 at 2).



AKIN GUMP
STRAUSS HAUER & FELD LLP
━━━━━━━━━ Attorneys at Law

Honorable Denise Cote
November 4, 2011
Page 14



        A deep concern for the Skowron children is echoed by everyone who knows them—it
cannot be denied that the case has already taken "a huge toll" on the family.  (Ex. 13 at 6).
Neighbor Mr. Behringer states:  "I know that their separation from their father, will be
devastating to them."  (Ex. 1 at 6).  Particularly concerned are the children's grandparents from
both sides of the family.  Dr. Skowron's father feels that his son's "absence will create an
unfillable void in their developing adolescent life."  (Ex. 30 at 7).  Mr. Skowron's wife, Sara
Skowron, says that she understands that the decision before the Court is a difficult one, but prays
that Your Honor will consider Dr. Skowron's children when making a decision that is "right and
fair."  (Ex. 31 at 5).  Finally, Cheryl's mother, Marilyn Birdsall, expresses that a prison sentence
will be a hardship on her four beautiful grandchildren, who "need their father to be there to
continue to help with their growth and development."  (Ex. 2 at 8).

        To hear Cheryl describe what is at stake for the Skowron family is just a small window
into the torment that they face each day, and will face every day, until their family is reunited.
Cheryl has asked Your Honor:

AKIN GUMP
STRAUSS HAUER & FELD LLP
━━━━━━ Attorneys at Law

Honorable Denise Cote
November 4, 2011
Page 15

████████████████████████████████████████████████ I
strive for a happy fulfilled family.  Love is a decision and breaking up our
marriage is not an option.  We are a good family.  And Chip is a good man.  Even
now.  Especially now.

(Ex. 29 at 15–17).

Dr. Skowron's concern and commitment to others stretches beyond his immediate family.
His brother-in-law Matthew Judice recalled how Dr. Skowron helped his daughter through a
difficult time: "When I, along with my wife and daughter, relocated to New York twelve years
ago, Chip was one of the first people to reach out to my family to make us feel welcome back to
New York from Texas.  Chip took special interest in our only daughter who was apprehensive
about moving.  He went out of his way to pick her up and take her to the Macy's Thanksgiving
Day parade with his family.  My daughter still remembers that to this day." (Ex. 11 at 3).

Among his extended family, Dr. Skowron is universally credited as the driving force that
has kept the family close, particularly in light of his father-in-law's unexpected death two years
ago.  His brother-in-law says: "In 2009, our father in law, Doug, passed away suddenly, another
devastating loss to Chip and our family.  In Reggie Jackson's words, Doug was 'the straw that
stirred the drink' in our family.  Chip took special interest in our family.  Chip has stepped into that role, often hosting
holidays at his house and taking over the ceremonial task of carving the turkey on
Thanksgiving." (Ex. 13 at 4).  Cheryl agrees that since her father's death, "Chip's become the
patriarch of our extended family.  He's loved and respected by all.  My dad was Chip's greatest
fan.  Were he still with us, his letter to you would've best portrayed Chip's sound moral fiber.
Every weekend my husband invites family and friends over and cooks dinner for everyone.  He
organizes our family vacations.  He brings people together.  Family and friends spending time
and supporting each other has always been his top priority." (Ex. 29 at 9).  Scotty Reiss
remembered that, despite being "devastated" over his father-in-law's death, "Chip organized
nearly the entire funeral and celebration of Doug's life, from selecting long-forgotten photos to
decorate the funeral hall, to choosing Doug's favorite foods and wines to serve at the reception,
to asking many of the important and influential people in Doug's life to speak about him (Doug
had been a senior airline executive).  "It was a touching and special day for everyone, and
through it we saw the depth of Chip and Doug's love for each other." (Ex. 26 at 8).

Marilyn Birdsall, Dr. Skowron's mother-in-law, credits Dr. Skowron with helping her
deal with the loss of her husband.  She said that:

Doug was the patriarch of the family.  He kept us together and created a happy,
secure family environment.  After his death, Chip filled his place and continues to

A K I N   G U M P
S T R A U S S   H A U E R   &   F E L D LLP
Attorneys at Law

Honorable Denise Cote
November 4, 2011
Page 16

do so.  He has the family to his home for holidays and family gatherings,
medically counsels us on various health issues, and helps to address our financial
needs.  Chip has helped me personally in many ways.  He continually calls me
and invites me to his home so that I am not alone.  I go with the family to
restaurants and on family vacations.  He validates the need for "Gramma" to be a
part of my grandchildren's lives.  The impact of his incarceration would be
devastating to me.  The feeling of loss and insecurity would once again be part of
my life.

(Ex. 2 at 2).

Doug Birdsall's lifelong friend, David Renton, felt compelled to speak on Doug's behalf:
"I would like to say a few words that I believe Doug would have wanted to say had he not passed
away two years ago. . . . He loved and admired Chip.  Doug often said that his two sons-in-law
were his best friends.  He was very happy his daughter Cheryl married Chip, and he would be
very concerned now naturally about his daughter, his beloved grandchildren and Chip."  (Ex. 27
at 3).

Many of Dr. Skowron's friends continue to stand by him, as evidenced by their heartfelt
letters to the Court.  College friend Andrew Stern said that he and Chip "became friends
immediately.  He has such a caring and warm demeanor, that most people who meet him stay
friends with him for life.  He is a rarity in terms of his loyalty and true compassion for others."
(Ex. 32 at 1).  Family friend Gail Stromire, who has known Dr. Skowron since he was three
years old, also recalled a time that Dr. Skowron reached out to another in kindness, saying:

One story close to my heart in this regard happened at my son's wedding at which
Chip was best man.  One of the bridesmaids had extensive paralysis and was
confined to a wheelchair.  Chip quietly moved in and helped her negotiate the
demands of this large social event and gave her the reassurance and comfort of his
presence.  In the excitement, few people noticed this special kindness.  I found it
to be very revealing.

(Ex. 33 at 4).  Mrs. Stromire was one of many to comment that Dr. Skowron is always generous
in sharing his medical experience with those in need, guiding them through complicated medical
issues.  She said he "is willing to take time for people who seek him out about their medical
concerns.  My husband was a beneficiary of Chip's caring ███████████████████████
███████████████████████.  Chip made all the medical arrangements for him for examination and
consultation ████████████████████████████████████████ (Ex. 33 at 3).
Neighbor Michael Behringer remembers that Dr. Skowron became a familiar face at the

AKIN GUMP
STRAUSS HAUER & FELD LLP
━━━━━━━━━ Attorneys at Law

Honorable Denise Cote
November 4, 2011
Page 17

Behringer home ███████████████████, saying, "Always a doctor, Chip checked in on me regularly, taking time off from work during the day, and time away from family at night, to make sure I was doing well and recuperating. Importantly, he made sure that my wife and children were managing well while I was laid up." (Ex. 1 at 3). Dr. Skowron's friend, Dr. Russell Turk, added that:

> Chip took a special interest this year in helping ████████████████
> ████████████████. After reviewing and discussing the
> medical care ████████ received, Chip offered his assistance in helping ██████
> struggle through this unexpected and ████████████ disease. In addition, Chip
> made sure we did not overlook the importance of faith in working towards a cure,
> and he insisted that our families spend more time together to build a supportive,
> nurturing environment ████████, and to let ████ know that we would get through
> this difficult time together.

(Ex. 34 at 2).

Scotty Reiss also recounted that in an emergency situation, Dr. Skowron could always be counted to come to the aid of his neighbors and friends: "When we were new to town, ████. Chip came right over and tended to ██████████ and gave us the name of a doctor to see. A couple of years later, my ████████████████████, and Chip rushed over to calm her and help convince her that she needed to go to the emergency room. We were grateful not only for his expert advice, but also his quick attention and compassion in our situation." (Ex. 26 at 3). When neighbor Michael Behringer's ████████████████ in the middle of the night, Dr. Skowron was the only person he thought to call. Mr. Behringer said that Dr. Skowron "answered the phone: ████████████ I'll be right over.' He rushed to our house and checked on ██████████ ████████. He stayed at our house through the night, watching over, feeding and entertaining our 4 year old daughter and 2 year old son until their grandparents arrived the next morning. We couldn't thank him enough, and when we did, he told us he was honored to be the one to get the call." (Ex. 1 at 4). This compassion for others is not just lavished on friends and neighbors. Dr. Turk recalled that:

> Chip took an interest in a medical problem a doctor in my office was struggling
> with. Upon hearing that my associate had an ████████████████ which was
> affecting her work, he immediately called a colleague, and assisted in getting an
> appointment with a top expert in the field—all this for a person he had never met.
> Sometime later, he called my associate to discuss her care and make sure things
> were going well. She got off the phone and walked into my office asking, "Who

A K I N   G U M P
S T R A U S S   H A U E R   &   F E L D L L P
Attorneys at Law

Honorable Denise Cote
November 4, 2011
Page 18


is this guy?" She could not believe a stranger would take such an interest in her
wellbeing.

(Ex. 34 at 3).

*Dr. Skowron's Personal and Professional Dedication to Volunteerism and Service*

Over the years, Dr. Skowron has helped bring life-saving medical care to complete
strangers in some of the world's most impoverished countries through his work with AmeriCares.
His friend Donald Carlson said that, "If there is one thing I know for certain about Chip is that he
was put on earth to tend to the hurt and broken and powerless people who are in desperate need
of healing. . . . I know with certainty that nothing gives him greater reward or brings him greater
joy than the work he does with Americares setting up clinics for families denied access to health
care under our broken system here in the United States." (Ex. 5 at 4).

The AmeriCares Foundation, as described by its President and CEO Curtis R. Welling, is
a 30-year-old nonprofit humanitarian aid and emergency relief organization which has delivered
more than $10 billion in medicines and medical assistance to more than 140 countries. It
responds to emergencies and natural disasters around the world, and provides primary care to
impoverished people through free clinics in the United States, and through clinic programs in
India and El Salvador. The Chairman of the AmeriCares Board of Directors, C. Dean Maglaris,
explains that "AmeriCares goes anywhere at any time to help as many people as possible," in
order to provide "life saving aid to those desperate souls in the midst of wars, famines, natural
disasters and poverty." (Ex. 18 at 3).

Until Dr. Benhamou's arrest, Dr. Skowron sat on the Board of this organization and, as
referenced in nearly every letter, his commitment to AmeriCares has been long-standing and
unwavering. As Curt Welling describes, "Chip was an outstanding director. He was passionate.
He was well informed. He was generous with both time and treasure. And as I have come to
know him better it has become clear to me: that he is a man of deep and genuine compassion for
and commitment to the poor and needy; that the work we do is very important to him spiritually
and emotionally." (Ex. 35 at 3). AmeriCares co-founder Leila Macauley wrote that, "Chip was
volunteered and sacrificed for years. His dedication and medical skills remain with the people he
has willingly served." (Ex. 17 at 3).

Dr. Skowron became involved with AmeriCares when his late father-in-law, Doug
Birdsall, took him to one of the organization's fundraising events. After that initial introduction,
he became one of the "many young people who appeared at our door asking to help because
'they wanted to make a difference,'" said co-founder Leila Macauley. He participated in his first

A K I N  G U M P
S T R A U S S  H A U E R  &  F E L D LLP
Attorneys at Law

Honorable Denise Cote
November 4, 2011
Page 19

airlift to Nicaragua in 1994, and has since travelled on similar humanitarian airlifts to Kosovo,
Cuba, India, El Salvador, and Haiti, and to New Orleans after Hurricane Katrina. His friend
Dean Maglaris noted that Dr. Skowron's "passion to help others has best been expressed by the
fact that for 7 years, he and his wife devoted all of their vacation time to allowing Chip to travel
on disaster relief missions with AmeriCares—always into chaotic, uncontrolled and sometimes
dangerous situations." (Ex. 18 at 8). Maglaris continued:

> One story about his work that stands out is from his efforts in Kosovo. In 1999,
> following over 10 years of occupation, Kosovo's liberation by NATO revealed a
> country filled with mass graves, littered with anti-personnel mines, and a
> devastated healthcare infrastructure. [AmeriCares co-founder] Bob Macauley
> wanted to help, so the organization asked Chip to go. At the time, Kosovo was
> considered the second most dangerous place on earth. Within 36 hours and
> without hesitation, Chip and two AmeriCares staffers boarded a transport for
> Skopje, Macedonia where they would then need to travel by land north to Pristina,
> Kosovo over a path cleared of land mines by NATO tanks. Chip met with
> surgeons from the University Hospital in Pristina and, through those meetings,
> AmeriCares began a long and successful endeavor to rebuild and equip the
> orthopedic surgery suites at the hospital.

(Ex. 18 at 5).

Dr. Skowron's efforts in that region continued long after initial mission ended—he used
his connections at Harvard to devise a long-term training program so that physicians from
Kosovo could train and study at Harvard. (Ex. 18 at 7). For his efforts, Dr. Skowron was the
recipient of the "Friends of Health" award, which was presented to him by the Minister of Health
and the Ambassador to the UN from Kosovo. (Ex. 18 at 7). Dr. Skowron's AmeriCares' team
was also one of the first nonprofits to reach the victims of Hurricane Katrina in 2005, where he
and the team worked "tirelessly in the flooded, powerless remains of a hospital developing
emergency medical care strategy and service to the victims of one of the great tragedies in
American history." (Ex. 25 at 3).

While these efforts are representative of the large scale impact of Dr. Skowron's
leadership, most recall the life-altering impact he has had on individuals. His friend Eugene
Morton recalled:

> In Guatemala City, in an Americares supported facility that assists those with
> birth deformities, he and I stood over the crib in which a four year old boy lay
> because he had been born with a deformed hip and could not stand. I asked—

AKIN GUMP
STRAUSS HAUER & FELDLLP
————————— Attorneys at Law

Honorable Denise Cote
November 4, 2011
Page 20

> "Chip, can anything be done for this child?"  The immediate answer came back—
> "Sure, I can surgically fix his problem and will be coming back down here shortly
> to do it."  He did and that child walks today.

(Ex. 23 at 4).

Even though Dr. Skowron eventually left medicine, he never left AmeriCares.  He took
part in an airlift to El Salvador in 2008 to deliver medical equipment.  (Ex. 5 at 3).  Over the last
few years, his role in the organization expanded from that of a doctor on the front lines to that of
a member of the Board of Directors, whose fundraising efforts insure that AmeriCares can send
the next generation young doctors to those most in need:

> As he has done with many other things in his life, Chip jumped into his
> responsibilities as Director with great enthusiasm, dedication and leadership. . . .
> During his tenure he directed the most successful annual "Airlift" Benefit in the
> organization's history, three years in a row.  This Benefit is AmeriCares'
> signature fundraising event of the year and is a major source of funding of our
> operations throughout the world.  Chip was instrumental in moving this event up
> to a new level . . .  His enthusiasm was infectious and a key element of our
> success.  His skills and determination are already missed on our Board and on our
> Development Committee.  In my many years in both business and the not-for-
> profit sectors, it is very rare to come across someone with such high standards and
> great commitment to "give back" as Chip Skowron.

(Ex. 18 at 10).  Dr. Skowron was also a major financial contributor on a personal level, and
encouraged his family, friends, and colleagues to join him in matching this generosity.  (Ex. 18 at
9).  When trying to quantify Dr. Skowron's contribution to the organization, Dr. Skowron's
brother-in-law, whose own work for AmeriCares was inspired by Dr. Skowron's, states that,
"Chip's contribution to AmeriCares and the people they serve would be difficult to measure.
How do you value how Chip has saved lives and performed surgeries that allowed a child to
keep a leg that was previously scheduled for amputation?"  (Ex. 13 at 5).  He then notes that the
"AmeriCares slogan, 'a passion to help, the ability to deliver,' could not better describe that
organization or Chip the individual."  (Ex. 13 at 5).

Dr. Skowron also gives in small ways.  He and his family participate in the holiday
"Adopt a Family" program every year, which provides holiday gifts for needy families, and
helped out with local fundraisers for the benefit of the community and local schools.  (Ex. 11 at
4).  He donated his family's former home to a local school for several years for faculty housing.

AKIN GUMP
STRAUSS HAUER & FELD LLP
Attorneys at Law

Honorable Denise Cote
November 4, 2011
Page 21

And he is kind. As his friend recalls, when the children's babysitter could not repair her car, Dr. Skowron let her use his car indefinitely. (Ex. 26 at 4).

Dr. Skowron's commitment to charity has even impacted the way in which those close to him live their own lives. Jennifer Zimmerman, the long-time girlfriend of Dr. Skowron's brother-in-law, said that Dr. Skowron's example has had a profound impact on her life: "Observing Chip travel the world to help those suffering and in need, I was inspired to become more aware and helpful myself. I was astonished that one person could have such an impact." (Ex. 37 at 3). She then went on to say that she had recently graduated from a clinical psychology program and decided that in lieu of gifts she asked her family and friends to donate to the African Famine Relief Fund. She then commented, "I am proud to say that I was able to raise over $800 in donations from my graduation party and the only reason this donation exists is because of the influence Chip Skowron has had on me. The thought to ask for donations in lieu of gifts at my graduation party would have never crossed my mind if Chip was not in my life and one of my role models." (Ex. 37 at 4).

*Dr. Skowron's Commitment to Religion and to Leading a Christian Life*

In addition to being devoted to his family and friends, Dr. Skowron is also committed to living his life in accordance with the Christian faith and values he holds dear. According to his father, Dr. Skowron was "baptized in a Christian church, taken to church regularly and raised according to Christian principles." (Ex. 30 at 2). He maintained that same religious upbringing when he started his own family, attending church every Sunday, and inviting clergy over for dinner. (Ex. 29 at 10). Dr. Skowron's mother-in-law, Marilyn Birdsall, said that "Chip is very committed to his faith. We meet at St. Catherine's every Sunday morning for the 9:00 a.m. mass. He has taught me the meaning of prayer and helped me renew my faith. After Doug died, I questioned why, if there was a God, he would take away someone who was so good and was so meaningful to his family. After many talks and a lot of tears, Chip helped me believe in God again." (Ex. 2 at 5).

Since Dr. Skowron's arrest, everyone around him has noticed that he has redoubled his efforts to live a Christian life. Dr. Skowron's friend, Gail Stromire, said that "[i]n this ordeal, Chip has drawn closer to the faith of his youth. He has joined a Christian support group of men sharing the same problems. He has adopted a discipline of study and prayer. He talks of his longing to be a better man." (Ex. 33 at 2). Some people in Dr. Skowron's life felt that the arrest gave new meaning to the religious teachings he had absorbed most of his life. His stepmother Sara Skowron said that, "Today, I see him truly walking the walk. He has surrounded himself with Godly people, established a strong faith and continuously studies God's Word. He has a devotional each morning with his four children and discusses carefully their understanding of the

A K I N   G U M P
S T R A U S S   H A U E R   &   F E L D ʟʟᴘ
Attorneys at Law

Honorable Denise Cote
November 4, 2011
Page 22


scripture. . . . I see him being humble and sincere in his faith in God though meeting adversity daily." (Ex. 31 at 3, 4).

Dr. Skowron's involvement with the New Canaan Society is an important example of his commitment to his faith. Dr. Skowron joined the New Canaan Society after his arrest. "The New Canaan Society (NCS) was started 15 years ago by a Christian Wall Street executive because he knew so many men in the workplace that needed an environment to share issues they were struggling with in their workplace and family. Today NCS has over 5000 Christian men encouraging and holding each other accountable to 'do the right thing.'" (Ex. 20 at 3). A leader of the New Haven Chapter of NCS, Pastor James Lillis, said that "[t]he group's primary purpose is to allow men of faith in Jesus Christ to gather fellowship and hear from other men about the challenges we face and how our faith in Christ sustained us. It allows its members to bring someone who is struggling in business, marriage or family issues and it gives them a safe place to be encouraged and strengthened." (Ex. 16 at 1). Pastor Lillis recalled Dr. Skowron's introduction into the group:

> I saw the humility and brokenness that God had brought to his life when he stated, "I did not come here today as a man who has gone through a crisis and is looking back, but rather as a man who is going through a crisis, and I have come to ask you to pray for me." Chip recognized his arrogance and in all humility reached out for help. It was a profound moment.

> * * *

> Your honor, I have been in ministry for nearly fifteen years now. I have not encountered such a bright mind and such passion for God as I have seen in Chip. He has such a drive to be excellent and he brings that drive to everything he does. He has thrown himself fully, wholly and passionately into the study of God. He has a God-given hunger for the word of God and to be around ministry.

(Ex. 16 at 2, 5).

While this group has become a great source of strength for Dr. Skowron throughout his ordeal, he has also provided friendship and sound advice to his fellow members. Fellow New Canaan Society member Greg Marposon said that despite the issues that Dr. Skowron was facing, he took time to help Marposon through his own troubling time: "Chip listened first, spoke last and asked me about the source of my sadness . . . His listening, compassion and prayers for me have freed me from sadness and set me into a course of action . . ." (Ex. 19 at 3).

AKIN GUMP
STRAUSS HAUER & FELD LLP
⎯⎯⎯⎯⎯⎯ Attorneys at Law

Honorable Denise Cote
November 4, 2011
Page 23

Dr. Skowron's friends and family have noticed the positive influence of the New Canaan Society. Friend Craig Reiss said, "I have had the privilege of seeing him with the New Canaan Group, and once again I marveled at how much more he gave to its members than he received, even though the support he received was not insignificant." (Ex. 25 at 8). Dr. Skowron's sister Cindi has seen the effect of this renewed religious commitment in her brother's life, saying that she has "seen Chip voraciously read and study the Bible on a consistent basis. He has sought out men of faith through his weekly meetings with the New Canaan Society, a network of men joined by a desire for a relationship with Jesus, and friendships with each other. Additionally, my brother has addressed personal changes that needed to take place by seeking time with several clergy who have come along side him to mentor, counsel and pray with him on a weekly and often daily basis." (Ex. 14 at 5).

All of those who know him believe that this renewed passion for religion is creating a foundation for the rest of his life. David Miller, an ordained minister and founder of the Princeton University Faith & Work Initiative, feels that the change in Dr. Skowron has been both real and significant.

> . . . Chip is fundamentally a good person, he is also a changed man. He has embraced his faith in a new and deeper way that has transformed him for the better in ways that no societal punishment or rehabilitation could ever accomplish. I have seen both phony and real "jail house conversions." I can vouch, as an experienced clergy person, that's Chip's newfound faith and ethical compass is as real and powerful as the cell he will be sitting in.

(Ex. 22 at 7).

## Dr. Skowron Has Suffered Severe Consequences

### Criminal and Civil Enforcement Proceedings

The criminal and SEC cases against him have created devastating legal and financial consequences for Dr. Skowron. He anticipates that the Court will impose a sentence of incarceration, and he has stipulated to a $5 million forfeiture order despite the fact that he received no direct gain from the offense of conviction. In addition, as part of a settlement with the SEC, Dr. Skowron has stipulated to a $2.7 million civil penalty to be paid to the SEC under § 21A of the Securities Exchange Act of 1934. This represents an approximate 2X penalty in relation to the $1.36 million that could be hypothetically attributed to Dr. Skowron as a result of the offense of conviction. In addition, he has accepted a permanent injunction against violating the securities laws and a lifetime bar against participation in the securities industry.

A K I N   G U M P
S T R A U S S   H A U E R   &   F E L D LLP
━━━━━━━━━━━━  Attorneys at Law

Honorable Denise Cote
November 4, 2011
Page 24


*Potential Claims by Morgan Stanley and FrontPoint*

Shortly after Dr. Skowron's plea, Morgan Stanley, which we understand to have wholly owned FrontPoint Partners during the relevant time period, notified him that it intends to bring a civil action for damages against him based on the conduct that gave rise to his guilty plea. FrontPoint later provided similar notice to Dr. Skowron.

Separate counsel is representing Dr. Skowron in connection with the potential civil claims of Morgan Stanley and FrontPoint. However, it is our understanding that Morgan Stanley and FrontPoint have outlined various potential claims and theories of damages that could create massive financial exposure for Dr. Skowron. We understand that Dr. Skowron, through separate counsel, is currently attempting to negotiate a settlement with Morgan Stanley and FrontPoint Partners, and that it is not possible to predict how these discussions will be resolved.

The uncertainty and financial pressures created by these threatened litigations would be daunting under any circumstances; against the backdrop of Dr. Skowron's impending separation from his wife and children, the strain on Dr. Skowron and his wife is palpable as they plan for an uncertain and threatening future. We will provide additional information about the civil claims of Morgan Stanley and FrontPoint if there are material changes prior to sentencing.

*Class Action Litigation in the District of Connecticut*

Dr. Skowron, together with FrontPoint Partners and certain of its affiliated entities, has also been sued by private plaintiffs in a putative class action arising from the insider trading at issue here. *See Brodzinsky v. FrontPoint Partners LLC*, No. 11-cv-10-WEE (D. Conn.). That action is brought principally under § 20A of the Securities Exchange Act of 1934 ("Exchange Act"), which codifies a private cause of action that may be asserted by individuals who traded "contemporaneously" with someone trading on the basis of material nonpublic information in violation of § 10(b) of the Exchange Act. The original complaint in that matter was filed on January 4, 2011, and stated allegations nearly identical to those in the then-current SEC complaint against Dr. Benhamou. The current complaint, which was filed on October 6, 2011, states allegations nearly identical to those in the amended SEC complaint. Dr. Skowron and the FrontPoint entities have filed motions to dismiss, which assert *inter alia* that the plaintiffs are not proper plaintiffs because their trading was not contemporaneous with FrontPoint's as that term is used in § 20A and the related caselaw; and that because the SEC has obtained complete disgorgement and § 20A only allows a plaintiff to recover insider trading profits that have not already been disgorged to the SEC, there will be no relief available to plaintiffs in the litigation. Plaintiffs' brief opposing the motions to dismiss is due November 17, 2011.

AKIN GUMP
STRAUSS HAUER & FELD LLP
━━━━━━━━ Attorneys at Law

Honorable Denise Cote
November 4, 2011
Page 25

*Reputation*

In addition to the other consequences outlined herein, Dr. Skowron has lived through the implosion of his reputation and standing in the community. His case has received wide media coverage, including prominent articles in the *Wall Street Journal*, the *New York Post*, and other publications. Although many of Dr. Skowron's friends have loyally stood by him, others have turned away and he and his family have experienced ostracism in some segments of their community. He has tried to insulate his wife and children, with limited success.

*Family*

Most poignantly, Dr. Skowron's wrongdoing has caused enormous pain and dislocation for his beloved family. Cheryl Skowron is heartbroken, disappointed, and scared. The four children are hurt and scared as well. Their situation has been exacerbated by the uncertainty that they have lived with for the past year, unsure not only of the duration of Dr. Skowron's incarceration but scared of the financial consequences of his admission of guilt and acceptance of the consequences of his actions.

For many years, Dr. Skowron has been the sole breadwinner for the family. He will be absent during his period of imprisonment, and his earning power has been massively diminished by his felony conviction. The financial liabilities that he has incurred, including additional exposures that he continues to face, threaten the stability of the family's day-to-day life.

As he approaches this sentencing and the fallout from his illegal acts, Dr. Skowron's top priority is to insulate his wife and children from further damage and dislocation. He is extremely focused on keeping his wife and children secure during his period of imprisonment and upon his release.

## ARGUMENT

*Term of Imprisonment*

The offense of conviction, conspiracy in violation of 18 U.S.C. § 371, carries a maximum sentence of five years' imprisonment. Pursuant to the plea agreement, the parties have agreed to a Stipulated Guidelines Sentence of 60 months. Dr. Skowron is constrained by the plea agreement from seeking a sentence shorter than the Stipulated Guidelines Range maximum, and

A K I N   G U M P
S T R A U S S   H A U E R   &   F E L D LLP
━━━━━━━━━━━━━ Attorneys at Law

Honorable Denise Cote
November 4, 2011
Page 26

he will abide by that constraint.[3]  In connection with the determination of an appropriate prison sentence, we merely draw the Court's attention to the relevant statute, 18 U.S.C. § 3553(a).

### Forfeiture

Dr. Skowron has stipulated to forfeiture in the amount of $5 million, and he has consented to an Order of Forfeiture in the form attached to the agreement as Exhibit 1.  The government has control of just under $5 million in funds beneficially owned by Dr. Skowron, which are frozen in an account at Bank of New York.  The small remainder (under $12,000) is being held in escrow by this firm pending the Court's entry of the stipulated order.  Dr. Skowron asks that the Court approve his stipulation to the forfeiture allegations and enter the agreed-upon Order of Forfeiture.

### Fine

Dr. Skowron comes from a family of ordinary means, and his family's current assets have been earned over many years by hard work.  As a result of Dr. Skowron's misconduct, he and his family have already absorbed very substantial out-of-pocket pecuniary losses, including a $5 million forfeiture order, a $2.7 million SEC penalty, and ongoing legal fees.  In addition, he is facing substantial claims by Morgan Stanley and FrontPoint Partners, which he is attempting to settle but which will, it is clear, be valued well in the millions of dollars.  On top of that, Dr. Skowron is defending the private class action suit described above.

In light of the punishment that he has already absorbed and very substantial financial consequences that are currently threatened and/or have already been imposed on Dr. Skowron and his family, and in light of the interest in insulating Dr. Skowron's family members from any further economic damage, we respectfully suggest that no fine is necessary in this case.

### Restitution

Under the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A, the Court is bound to order restitution to identifiable victims of Dr. Skowron's offense of conviction. The PSR identifies five investors as victims because they purchased HGSI stock from the FrontPoint Healthcare funds in a block trade on January 22, 2008, at a time when the funds possessed material nonpublic information.  We agree that traders who transact with a counterparty while

---

[3] To the extent any of the individuals who wrote letters on Dr. Skowron's behalf have made such a request, they speak for themselves. Dr. Skowron has not asked those writing for him to make such a request; to the contrary, he specifically noted the plea agreement's constraint when he invited friends and family to write to the Court.

A K I N   G U M P
S T R A U S S   H A U E R   &   F E L D LLP
⎯⎯⎯⎯⎯⎯ Attorneys at Law

Honorable Denise Cote
November 4, 2011
Page 27

the counterparty is improperly in possession of material nonpublic information, and who incur identifiable economic harm as a result, are properly understood as "victims" within the meaning of the restitution statute.

The PSR assigns a loss figure for three of the five counterparties who are said to have purchased HGSI from the FrontPoint Healthcare funds on January 22, 2008: Deutsche Bank ($2.4 million); T. Rowe Price Associates, Inc. ($877,261.50); and First NY Securities LLC ($91,980). (PSR ¶ 38). However, no losses are specified with respect to the other two counterparties, Galleon Group LLC or D.E. Shaw. Without identifiable losses, no restitution can be ordered with respect to these latter two parties.

More generally, however, with respect to all five identified counterparties, the SEC has obtained complete disgorgement of the amount of the loss that the FrontPoint Healthcare funds improperly avoided by reason of their insider trading. The disgorged funds have been placed in escrow and it is anticipated that the funds will be distributed to injured counterparties pursuant to a Fair Funds procedure upon approval of the SEC settlement and a distribution plan by Judge Batts.

To determine the disgorgement amount paid into escrow by the FrontPoint Healthcare funds, we understand that the SEC has calculated the difference between the sale price for all trades while the FrontPoint Healthcare funds were in possession of material nonpublic information and the closing price of HGSI on January 23, 2008, the day on which the material information was publicly disclosed. The disgorgement figure thus represents the maximum amount of trading loss that the five counterparties identified in ¶ 38 of the PSR could have suffered as a consequence of the unlawful trading at issue here.

Because the SEC has obtained complete disgorgement of the avoided loss and intends to use a rigorous, legally-sanctioned procedure to disburse those disgorged funds to make identifiable victims whole, it is a near certainty that the counterparties identified as victims in the PSR will be fully compensated for their losses through the Fair Funds process. Further, it is fully appropriate to use the disgorged funds as the proceeds for restitution because the FrontPoint Healthcare funds, which paid the disgorgement, were the parties that realized the benefit of the unlawful trades here. In addition, Dr. Skowron has paid a $2.7 million penalty that will also be available for distribution to injured investors pursuant to the Fair Funds procedure. Given all of this, it would be anomalous and unfair if Dr. Skowron were required to pay any additional amount as restitution to the injured counterparties as part of his criminal sentence. Such an outcome would be unjust and would cause substantial and unwarranted financial harm to Dr. Skowron's family.

A K I N  G U M P
S T R A U S S  H A U E R  &  F E L D LLP
_____ Attorneys at Law

Honorable Denise Cote
November 4, 2011
Page 28


In light of these circumstances, we request, pursuant to 18 U.S.C. §3572(d), that any order of restitution against Dr. Skowron with respect to trading counterparties provide for payment on a date certain that is set 18 months beyond the date of sentencing. Such an order would be in the interests of justice because, as noted above, the parties that actually received the ill-gotten gains—the FrontPoint Healthcare funds—have placed the money in escrow for distribution to the injured counterparties, and the money is expected to be paid out, pursuant to a court-authorized process, within approximately 18 months. Further, Dr. Skowron's financial resources, while not insubstantial, are in significant part illiquid, will be steadily depleted in the coming years, and are subject to potentially crippling civil claims that remain unresolved. As a result of all of this, the stability of the Skowron family's day-to-day living arrangements would be thrown into jeopardy if full restitution were ordered immediately and without regard to the SEC process that is getting underway. *See also* 18 U.S.C. § 3664(f)(2) (in determining timing of repayment under restitution order, court should consider defendant's financial circumstances and obligations to dependants).

Pursuant to § 3572(d), we also request that the judgment in this case make clear that any restitution order with respect to trading counterparties is intended to become enforceable only after the SEC's Fair Funds process is complete and that any amount owed to trading counterparties as restitution will be reduced dollar-for-dollar by amounts recovered by them through Fair Funds disbursements. For the reasons stated herein, such a provision would be in the interests of justice. *See* 18 U.S.C. § 3572(d); *see also In re Newsday Litigation*, No. 05-mc-747 *et al.*, 2008 WL 4279570 (E.D.N.Y. Sept. 18, 2008); *In re Newsday Litig.*, No. 05-mc-747, 2008 WL 2884784 (E.D.N.Y. July 23, 2008) (underlying report and recommendation). In the *Newsday* case, individuals engaged in a scheme that enriched their employer, and the employer subsequently disbursed the wrongfully obtained funds to make victims whole. Against this backdrop, Judge Weinstein determined that no restitution obligation should be imposed on the individual defendants because "[m]ost victims have been made whole." *Id.* at *3. That is similar to the situation here, where Dr. Skowron's conduct enriched his employer to the detriment of others, and the SEC will administer the employer's disgorged funds to compensate the victims. The same result should therefore follow: the party that was wrongfully enriched should compensate victims, and Dr. Skowron's restitution obligation should be eliminated once the compensation has been paid. *See also United States v. Dawson*, 250 F.3d 1048 (7th Cir. 2001) (defendant would be entitled to reduction in restitution to reflect victim's recovery from unindicted individuals involved in the offense).

Finally, although the PSR identifies other entities as victims, it is not clear that any other party is seeking restitution. Accordingly, we do not address restitution with respect to other parties at this point, but we reserve our right to respond as necessary to any additional claims for restitution.

AKIN GUMP
STRAUSS HAUER & FELD LLP
Attorneys at Law

Honorable Denise Cote
November 4, 2011
Page 29

## CONCLUSION

We respectfully ask the Court to impose a just sentence in light of the considerations set forth in the PSR and in this submission.

Respectfully submitted,

James J. Benjamin, Jr.
Samidh Guha

cc:    AUSAs Reed Brodsky, Pablo Quiñones, and David Massey

## Letters to the Court

From friend Michael P. Behringer ................................................................... Ex. 1

From mother-in-law Marilyn Birdsall................................................................ Ex. 2

From childhood friend Scott Bonhannon........................................................... Ex. 3

From younger sister Jodie Skowron Caddell ................................................... Ex. 4

From friend Donald R. Carlson ....................................................................... Ex. 5

From friend and colleague Jay Coyle ............................................................. Ex. 6

From medical school friend Steven Craig, M.D. ............................................. Ex. 7

From pastor Rev. Monsignor Alan F. Detscher............................................... Ex. 8

From cousins Michaela and Matthew Evans ................................................... Ex. 9

From friend George Hritz ................................................................................ Ex. 10

From brother-in-law's brother Matthew Judice .............................................. Ex. 11

From sister-in-law Michelle Judice.................................................................. Ex. 12

From brother-in-law William K. Judice ........................................................... Ex. 13

From sister Cindi Kinney.................................................................................. Ex. 14

From fellow AmeriCares Board Member Jerry P. Leamon ............................. Ex. 15

From minister Pastor James Lillis.................................................................... Ex. 16

From friend and former co-worker Leila Macauley ........................................ Ex. 17

From friend and Chairman of the AmeriCares board C. Dean Maglaris ....... Ex. 18

From friend Greg Marposon ............................................................................ Ex. 19

From friend Andreas Metzger .......................................................................... Ex. 20

From friend Paul Michalski .............................................................................. Ex. 21

From friend Rev. Dr. David W. Miller .............................................................. Ex. 22

From friend Eugene D. Morton ........................................................................ Ex. 23

From friend Chad Petterson............................................................................. Ex. 24

From friend Craig Reiss ................................................................................... Ex. 25

From friend Scotty Reiss ................................................................................. Ex. 26

From friend David M. Renton ........................................................................... Ex. 27

From friend Michael Schlosser ........................................................................ Ex. 28

From wife Cheryl Skowron ............................................................................... Ex. 29

From father Joseph F. Skowron II ................................................................... Ex. 30

From stepmother Sara Skowron....................................................................... Ex. 31

From friend Andrew Stern ................................................................................ Ex. 32

From family friend Gail Stromire....................................................................... Ex. 33

From friend Russell Turk, M.D. ........................................................................ Ex. 34

From friend and President and CEO of AmeriCares Curtis R. Welling.......... Ex. 35

From friend Doran R. Wright............................................................................. Ex. 36

From brother-in-law's girlfriend Jennifer Zimmerman ................................... Ex. 37