UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
            :
UNITED STATES OF AMERICA    :
            :
    -v.-    :
            :   11 Cr. 699 (DLC)
JOSEPH F. SKOWRON,    :
    a/k/a "Chip Skowron,"    :
            :
        Defendant.    :
            :
------------------------------------x

## GOVERNMENT'S SENTENCING MEMORANDUM

                                          PREET BHARARA
                                          United States Attorney for the Southern
                                          District of New York,
                                          Attorney for the United States of America

PABLO QUIÑONES
REED M. BRODSKY
DAVID B. MASSEY
Assistant United States Attorneys
    - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                :
UNITED STATES OF AMERICA        :
                :
    -v.-                :
                :   11 Cr. 699 (DLC)
JOSEPH F. SKOWRON,        :
    a/k/a "Chip Skowron,"       :
                :
        Defendant.       :
                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM

The Government respectfully submits this memorandum in connection with the sentencing of Joseph F. Skowron, III, a/k/a "Chip Skowron," which is scheduled for November 18, 2011. For the reasons set forth below, the Government respectfully submits that the Court should adopt the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") calculations recommended by the United States Probation Office in its Presentence Investigation Report, dated November 10, 2011 ("Presentence Report" or "PSR"). The Government further submits that the Court should sentence Skowron to the uncontested, resulting Guidelines range of 60 months' imprisonment. Such a sentence is reasonable and sufficient but not greater than necessary to meet the goals of sentencing.

1. **The Offense Conduct**

The offense conduct of Joseph F. Skowron, III ("Skowron") is fully detailed in the Presentence Report and is not disputed. What bears noting is that Skowron was a prominent and well-respected portfolio manager for FrontPoint Partners ("FrontPoint"), a multi-billion dollar

1

hedge fund owned by Morgan Stanley, which, among other things, traded in the shares of publicly-held healthcare companies. His expertise and experience in the healthcare industry were bolstered by his prior experience as a medical doctor trained by some of the finest institutions in the United States. Alongside his medical and financial experience, Skowron outwardly appeared to be a "good person" dedicated to serving others, attending church on Sundays, and raising a family with strong moral values.

Skowron's outward appearance, however, stands in contrast to the corrupt character that conspired to commit securities fraud and to obstruct justice in order to conceal his fraud. Skowron used his personal and financial relationship with another well-regarded medical doctor, Yves Benhamou, to encourage Benhamou to disclose inside information about Human Genome Science, Inc.'s clinical drug trials of Albuferon. After he had received this inside information, Skowron caused the portfolios that he co-managed to sell millions of shares of HGSI to unsuspecting buyers who did not have the benefit of HGSI's secret information. In the process, he avoided losing approximately $30 million at the expense of buyers on the public market. At its core, Skowron's conduct undermined the public's confidence in the integrity of our financial markets, cheated numerous unsuspecting buyers of HGSI stock, and exploited secret information improperly taken from HGSI. Skowron engaged in his fraudulent conduct deliberately and fully aware that trading on inside information was a crime and that the penalties for insider trading included a "jail sentence." (PSR ¶ 14).[1]

---

[1]   Skowron's wife's sentencing letter, dated October 1, 2011, however, states that "[Skowron] says he had no idea prison was a possibility otherwise he never would've done it." (See Skowron's Sentencing Letter.Brief, dated November 4, 2011 (herein "Skowron Sent. Br.") Ex. 29 at 1.) If Skowron - - a well-educated, Wall Street portfolio manager overseeing millions of dollars of trading on a daily basis - - didn't know a jail sentence was a possibility, then a

2

But Skowron's criminal conduct did not stop with conspiring to commit securities fraud. When the prospect of being caught by the Securities and Exchange Commission came to light, Skowron again conspired with Benhamou to obstruct the SEC investigation by lying about their criminal conduct. (PSR ¶¶ 29-34). As explained in Morgan Stanley's victim letter, Skowron's lies were persistent and pervasive:

> After engaging in that insider trading, Skowron embarked on a pattern of concealment of illegal conduct from Morgan Stanley and the various governmental entities investigating his actions, including the United States Securities and Exchange Commission ("SEC"). To that end, Skowron repeatedly lied to Morgan Stanley, the SEC and other government entities, claiming that he had not received or traded on inside information and that he had no improper relationship with Benhamou. Skowron also convinced Benhamou to lie about their misconduct to both Morgan Stanley and the Government.

(*See* Morgan Stanley letter, dated October 21, 2011, at 2, attached as Ex. A). Most significantly, Skowron lied under oath, and encouraged Benhamou to lie, in a failed attempt to escape the consequences of his crime. (PSR ¶¶ 30-34, 70). The time has now come for Skowron to face the legal consequences of his criminal conduct.

2. **Applicable Guidelines Range**

In the Presentence Report, the Probation Office determined that the Guidelines apply to Skowron's case in the following manner: (i) the base offense level is eight, pursuant to U.S.S.G. § 2B1.4(a); (ii) because the offense involved a loss of between $20 million and $50 million, 22 levels are added pursuant to U.S.S.G. §§ 2B1.4(b)(1) and 2B1.1(b)(1)(L); (iii) because Skowron obstructed justice with respect to the SEC investigation of the instant offense of conviction, two

---

sentence of imprisonment in this case is especially important to achieve general deterrence.

levels are added pursuant to U.S.S.G. § 3C1.1; and (iv) because Skowron's statements at his plea and to the Probation Office timely reflect his acceptance of responsibility, three levels are subtracted pursuant to U.S.S.G. § 3E1.1 (PSR ¶¶ 74-80). Accordingly, the Probation Office concluded that Skowron's total offense level is 29. (PSR ¶ 83). Finding that Skowron has no criminal history points (PSR ¶ 86), the Probation Office identified the applicable Guidelines range to be 87 to 108 months' imprisonment. (PSR ¶ 138). However, the range is reduced to 60 months - - which is 27 to 48 months below the offense level calculation - - because the offense of conviction has a statutory maximum of 60 months' imprisonment. (PSR ¶ 138). Consistent with the plea agreement, the Probation Office recommends a sentence of 60 months' imprisonment. (PSR at 47 (Sentencing Recommendation)). Skowron does not dispute the sentencing range of 87 to 108 months' imprisonment or the applicable sentence of 60 months' imprisonment based on the maximum penalty for the offense of conviction. (Skowron Sent. Br. at 4). More importantly, Skowron's sentencing submission makes clear that he has agreed not to seek a sentence other than 60 months' imprisonment (*see* Skowron Sent. Br. at 7 and 25) and expressly disavows any letters submitted to the Court by anyone to the extent they request a sentence of less than 60 months' imprisonment. (Skowron Sent. Br. at 25, n.3). Accordingly, the undisputed sentence that both parties agree is reasonable and applicable to Skowron's criminal conduct in this case is 60 months' imprisonment.

    3.    **Applicable Law**

While the Sentencing Guidelines are no longer mandatory, they nevertheless continue to play a critical role in the federal sentencing process. *United States* v. *Booker*, 543 U.S. 220, 252 (2005); *see United States* v. *Crosby*, 397 F.3d 103, 113 (2d Cir. 2005) ("[I]t is important to bear

in mind that *Booker/Fanfan* and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge."). Indeed, the applicable Sentencing Guidelines range "will be a benchmark or a point of reference or departure" when considering a particular sentence to impose. *United States* v. *Rubenstein*, 403 F.3d 93, 98-99 (2d Cir. 2005).

A sentencing court is required to "consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims" *United States* v. *Booker*, 543 U.S. at 260 (citations omitted); *see also id.* at 264 ("The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing.").

Apart from the Sentencing Guidelines, as the Court is aware, the other factors set forth in Section 3553(a) must be considered. Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two. That sub-paragraph sets forth the purposes as follows:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

Section 3553(a) further directs the Court—in determining the particular sentence to impose—to

5

consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentences and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

4. **Discussion**

Based on the factors in Title 18, United States Code, Section 3553(a), the Court should sentence Skowron to a term of 60 months' imprisonment. Such a sentence adequately takes into account the applicable Guidelines range and the other matters to which Skowron has drawn the Court's attention. First, the Guidelines calculation for Skowron's offense conduct, absent the statutory maximum, would be 87 to 108 months' imprisonment. Because the Government exercised its discretion to charge Skowron with conspiring to commit securities fraud and obstruction of justice, Skowron already faces a sentence substantially below what the Guidelines would normally recommend. Had the Government also charged Skowron with the substantive offenses that are the objects of the conspiracy, he would have faced a total statutory maximum sentence of 30 years' imprisonment – that is, 20 years for securities fraud, 5 years for obstruction of justice, and 5 years for conspiring to commit both offenses. Thus, Skowron already has received a substantial reduction in his potential sentence based, in part, on many of the same sentencing factors that he and his supporters now raise with the Court.

Second, Skowron has stipulated to a sentence of 60 months' imprisonment.

Third, although Skowron has focused the Court's attention on his family commitments,

charitable interest, and Christian values under Title 18, United States Code, Section 3553(a), the Court's consideration of those factors do not warrant the Court's *sua sponte* imposition of a sentence below the stipulated sentence.

    a.    <u>The Nature and Circumstances of Skowron's Criminal Offense</u>

Lying and cheating to make money is fundamentally wrong and Skowron knew that he was committing a serious crime when he used an HGSI insider to provide him with material, nonpublic information in violation of the insider's fiduciary duties and concealed their crime. In doing so, Skowron harmed and betrayed the trust of countless individuals. Skowron has, at times, attributed his conduct to abandoning his medical career to obtain "the pot of gold at the end of the hedge fund rainbow." (Skowron Sent. Br., Ex. 5 at 2.) But it was not Skowron's decision to pursue a financial career, rather than a medical career, that led to Skowron's criminal conduct. Skowron's criminal conduct demonstrated a willingness to abandon everything he knew to be right for the potential benefit of what he knew to be wrong. The fact that insider trading securities fraud is a crime is not a secret in the financial industry. Skowron's employers trained and educated him repeatedly during his career on the dangers and potential consequences of insider trading. (PSR ¶¶ 14-15). Skowron, because of his deep intellect, understood what he was doing perhaps better than most. Yet, rather than comply with the law, Skowron chose to disregard it and become a corrupting influence.

Beginning in April 2007, Skowron manipulatively developed a relationship with Yves Benhamou, a renowned medical doctor and expert in the field of hepatology, with hand-to-hand cash payments outside the country and payment for an expensive hotel in Manhattan; Skowron also tempted Benhamou with greater wealth in the hedge fund world. (PSR ¶¶ 9, 18). By

December 2007, Skowron began to reap the "reward" for his efforts when he received from Benhamou confidential information about HGSI that he then used to trade HGSI stock. (PSR ¶ 21). The time between mid-December 2007 and January 22, 2008 is especially important because it demonstrates a persistent effort by Skowron to obtain secret information about HGSI's clinical drug trials and to use it in making trading decisions for the hedge fund until the end of the trading day before HGSI publicly disclosed the information. (PSR ¶¶ 21-25). While Skowron may have only illegally traded in one stock, he improperly continued to do so over a significant period of time. Skowron's conduct was not the result of a single trade or isolated lapse in judgment. Skowron's criminal conduct crescendoed over a month-long decision process that grew in intensity as the quality of information improved. (PSR ¶ 24).

Skowron completely disregarded the harm that his actions caused to the marketplace and the ordinary investor who did not and could not have obtained access to inside information. His conduct was serious and damaging to the capital markets. However, Skowron did not care. What mattered to Skowron was not getting caught, and not having his fraud exposed to the light of day.

Skowron demonstrated his deceptive character again when he conspired with Benhamou to lie about the serious fraud they had committed together. Skowron urged Benhamou to lie in response to an SEC inquiry and made another cash payment to Benhamou as the SEC investigation progressed. (PSR ¶¶ 29-32). Subsequently, both Benhamou and Skowron separately lied to the SEC and continued to coordinate their fabricated story in a deliberate attempt to mislead regulators and conceal their fraud. (PSR ¶¶ 33-34). Skowron lied under oath to the SEC in August 2009 about his dealings with Benhamou and the discussions they had about

the Albuferon clinical trials. (PSR ¶ 34).

In committing the instant offenses, Skowron was a manipulative and a corrupting influence; a dark star leading himself and Benhamou on a crash course with the truth of their crimes. On November 2, 2010, following Benhamou's arrest on a criminal complaint, Skowron realized that his criminal conspiracy was coming to light. Benhamou's arrest sent a public and clear signal to Skowron that his arrest may come soon and the fear of being arrested immediately led to a change in Skowron's behavior that was apparent to his family. Skowron's sister's sentencing letter is perhaps the most telling:

> I am truly thankful for the new brother that has emerged in the last 10 months – since Dr. Benhamou's arrest. Although I wish his metamorphosis had not come at the high cost of deeply hurting so many other people.

(*See* Skowron Sent. Br., Ex. 14 at 1). As Skowron well knows, the effects of his criminal conduct have been widespread and significant.

Indeed, to fully appreciate the magnitude of Skowron's offense, the Court has to be mindful of all those who have been directly and indirectly harmed by Skowron's conduct. Several financial institutions lost millions of dollars. (PSR ¶ 45 - 49; 61). Individuals who purchased HGSI stock on the open market when Skowron was trading with the benefit of inside information were duped into trusting the integrity of our public stock market and consequently overpaying for HGSI stock. HGSI's confidential information was misappropriated and its resources and time diverted to regulatory and criminal investigations rather than the development of beneficial drugs. (PSR ¶¶ 50-54). The multi-billion dollar FrontPoint hedge funds imploded and numerous of Skowron's professional colleagues - - many with their own families - - lost their

jobs. (PSR ¶¶ 60-67). The victim letters provided to the Court bear out the enormous magnitude and fallout caused by Skowron's conduct. *See* Exhibit A (Morgan Stanley letter), Exhibit B (HGSI letter), Exhibit C (Deutche Bank letter), Exhibit D (Galleon Group letter), Exhibit E (D.E. Shaw letter), Exhibit F (T. Rowe Price Associates letter), and Exhibit G (First New York Securities letter).

      b.     <u>History and Characteristics of the Defendant</u>

Notwithstanding the letters submitted to the Court from Skowron's family and friends, Skowron's offense conduct demonstrates that he behaved as a fundamentally deceptive and dishonest person in committing the instant offense. He demonstrated an utter lack of respect for the law and compounded that disregard when he lied under oath during the SEC's investigation. While Skowron has more recently renewed his commitment to his family, religion, and serving others, those laudable goals were clearly not his priorities when he committed the crimes for which he is being sentenced.

Prior to his arrest, Skowron prioritized his career and success before his family, which hurt his marriage. (PSR ¶¶ 92, 95). Skowron also hurt his marriage and family with his drug use, as he kept and smoked marijuana in his home, rather than spend that time with his children. (PSR ¶ 122).

Skowron's reliance on his Christian faith – while not ordinarily relevant to sentencing[2] – requires a response because a large number of the letters submitted on his behalf are by fellow Christians who claim his "remorse" and "faith" are genuine and plead for "mercy" and "grace" from the Court. The Court, however, is not being asked to decide the genuineness of Skowron's faith or to measure the mercy and grace attributable to it. Skowron is being sentenced for his criminal conduct regardless of whether, as Skowron's step-mother said, "[h]e had been taking his family to church weekly but until the last months, talked the talk, but failed to walk the walk." (*See* Skowron Sent. Br., Ex. 31).

Finally, Skowron's charitable interests and future good works as a medical doctor are not, as some of Skowron's supporters claim, a sufficient reason to not impose the stipulated sentence. There is no dispute that when Skowron practiced medicine he assisted others and that he devoted some of his substantial resources to assisting others after he joined the financial industry. Those efforts are laudable, but they do not excuse his crimes and did not prevent him from committing them at the time. Service to others often helps one to appreciate what one has relative to the less fortunate. Rather than appreciate what he had through serving others, Skowron used deception to attempt to acquire more for himself and to conceal his wrongdoing. Additionally, while Skowron's medical skills could be put to use outside prison, that is hardly a basis to give him a reduced sentence for his crimes. Most defendants have to varying degrees an ability to help

---

[2] The policy statements to the Guidelines make clear that Congress intended that courts not consider religion as a specific-offender characteristic that either supports a greater or lesser sentence. *See* U.S.S.G. § 5H1.10 ("[Race, sex, national origin, creed, religion, and socio-economic status] are not relevant in the determination of a sentence."); *United States* v. *Sprei*, 145 F.3d 528, 536 (2d Cir. 1998) (vacating a sentence that appeared to treat adherents of one religious sect more favorably than non-adherents).

11

others that could be put to good use if they were not in prison. Moreover, unlike defendants whose lack of financial well-being or educational opportunities led them to commit crimes, Skowron had every opportunity to live a full and wonderful life without resorting to criminal conduct.

    c.    <u>The Need To Afford Adequate Deterrence</u>

One of the most important factors that this Court must consider in imposing a sentence under Section 3553(a) is the need for the sentence to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). Given the inherent difficulties in detecting and prosecuting illegal insider trading crimes and the evidence of rampant insider trading during the last several years, imposition of the stipulated sentence is necessary, and indeed essential, to achieve the goals of general deterrence. Like Skowron, numerous individuals in the financial industry are specifically trained and warned about the potential criminal implications of insider trading every year. Yet, time and time again, like Skowron, they ignore those warnings and make a cost-benefit analysis between the punishment if caught and the benefits of success. The imposition of the stipulated sentence in this case will adequately deter others from similar criminal conduct.

    d.    <u>Application of the Sentencing Guidelines</u>

The applicable guidelines sentence is 60 months' imprisonment as discussed above.

    e.    <u>Restitution</u>

        (1)    Victim Investors

The parties do not dispute that the investors who purchased HGSI stock from FrontPoint in block trades on January 22, 2008, are victims entitled to restitution. The amount of their uncontested losses are as follows:

| Victim | Loss |
|---|---:|
| Deutsche Bank | $2,400,000.00 |
| Galleon Group | $1,563,739.00 |
| D.E. Shaw | $1,007,475.00 |
| T. Rowe Price | $877.261.50 |
| First New York Securities | $107,676.80 |

(PSR ¶ 147). Although Skowron does not dispute that the above identifiable victim investors are entitled to restitution, he seeks a restitution order that obligates him to make payments commencing 18 months after his sentencing date – that is, May 18, 2013. This date is based on the potential length of time it may take for the SEC to obtain court approval in a federal civil proceeding of a settlement with FrontPoint that fully disgorges the amount of avoided losses, plus interest, attributable to Skowron's conduct and the subsequent creation and administration of a distribution fund for the purchasers of HGSI stock, including the identifiable victims.

Under Title 18, United States Code, Sections 3664(f)(2) and 3572(d), the Court has the authority to set the commencement of the defendant's restitution obligation to commence on a date certain in the interest of justice. Furthermore, Title 18, United States Code, Section 3664(j)(2) provides that "[a]ny amount paid to a victim under an order of restitution shall be reduced by any later recovered compensatory damage for the same loss by the victim in [] any

13

Federal civil proceeding." Accordingly, the Government does not dispute that the Court may delay the commencement of Skowron's restitution obligation to these identifiable victims while the SEC civil proceeding completes the process of distributing the disgorged funds to reimburse these same victim investors. In that regard, the Government requests that the restitution order provide, as to the victim investors, that Skowron's restitution obligation shall be deemed reduced by any amounts recovered by these victims for the same losses on or before whatever date certain the Court selects. However, because the Government seeks below additional time for Morgan Stanley and/or FrontPoint to fully submit their victim claims, the Government respectfully requests that the Court wait until those claims are resolved to select a date upon which Skowron's restitution obligation to victim investors commences. In the interim, the parties may be better able to propose a date that fairly takes into account when victim investors will receive reimbursement from the SEC fund.

  (2) HGSI

HGSI has incurred in excess of $100,000 in legal expenses related to the investigation and prosecution of Skowron and Benhamou. (PSR ¶ 54). Such legal expenses are recoverable pursuant to Title 18, United States Code, Section 3663A(b)(4) "only if they were 'necessary' and 'incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense.'" *See United States v. Amato*, 540 F.3d 153, 161 (2d Cir. 2008). In *Amato*, the law firm that billed for the legal expenses submitted a declaration explaining its work, how it represented the company at meetings with the government, assisted in gathering and producing evidence necessary to the government's prosecution, worked with the authorities investigating the offense, and attached invoices and documents to substantiate the

14

costs incurred. *Amato*, 540 F.3d at 162-63. HGSI has decided, however, not to seek restitution, as is its right. *See* 18 U.S.C. § 3664(g)(1) ("No victim shall be required to participate in any phase of a restitution order.")

        (3)    Morgan Stanley

Morgan Stanley has indicated that it must indemnify FrontPoint for its settlement with the SEC, has already paid approximately $4 million in legal expenses and costs related to Skowron's criminal conduct, and paid Skowron more than $32 million while "he was acting as the classic faithless servant, engaging in and concealing his crime." (*See* Morgan Stanley letter, Ex. A at 2-3). Skowron, however, is in the process of resolving any potential claims by Morgan Stanley and FrontPoint. (*See* Skowron Sent. Br. at 24). In light of those ongoing settlement discussions, the Government respectfully request that the Court delay entry of a restitution order. Specifically, the Government requests that Morgan Stanley and/or FrontPoint be permitted to submit its restitution claim and any supporting documents on or before December 14, 2011. Any opposition papers would be due on or before January 6, 2011, and any reply would be due on or before January 20, 2012. Such a schedule would permit the Court to enter an appropriate restitution order as to all victims within 90 days after Skowron's sentencing.

    f.    <u>Fine</u>

Surprisingly, Skowron claims financial hardship in seeking to avoid the imposition of a fine. From January 2007 to December 2010, Morgan Stanley paid Skowron approximately $32 million in total compensation. (PSR ¶ 63). His primary residence is worth approximately $7 million. (PSR Financial Addendum ¶ 7). He has substantially more assets in real property, investments, and expensive cars, including a 2008 Porsche Cayenne, a 2006 Aston Martin

Vanquish, 2009 Alfa Romeo 8C Spider, and a 2007 Ariel Atom II race car. (PSR Financial Addendum ¶ 6). Skowron's net worth is approximately $20 million even after paying the $5 million in forfeiture. (PSR Financial Addendum ¶ 16). Thus, Skowron has substantial wealth and should be ordered to pay the statutory maximum fine of $250,000. (PSR ¶ 143).[3]

The Probation Office, however, recommends a fine of $150,000, which is the maximum fine under the applicable Guidelines range of $15,000 to $150,000. (PSR at 51). Based on the magnitude of the offense and Skowron's financial resources, the Government submits that a $150,000 fine would be insufficient and have no meaningful impact on Skowron. Furthermore, the imposition of a $250,000 fine would not prevent Skowron from meeting his restitution obligations to victim investors because they will be primarily compensated through the SEC's fund. Such a fine also would not prevent him from meeting his $5 million forfeiture obligation because those funds have been set aside already. A copy of the proposed Forfeiture Order is being provided to the Court along with this memorandum.

---

[3] The alternative fine potentially available based on pecuniary gain to the defendant or loss to another, would justify a fine far in excess of $250,000. However, the Government does not seek a higher fine to avoid unduly prolonging the sentencing proceedings. *See* 18 U.S.C. § 3571(d).

5.  **Conclusion**

For the foregoing reasons, the Government respectfully submits that this Court should sentence Skowron to the stipulated sentence of 60 months' imprisonment, impose a fine of $250,000, enter the Forfeiture Order agreed to pursuant to the plea agreement, and postpone the imposition of a restitution order for up to 90 days to resolve the calculation and payment of victims' losses.

Dated:  New York, New York
        November 14, 2011

                                    Respectfully submitted,

                                    PREET BHARARA
                                    United States Attorney

                            By:     _____
                                    PABLO QUIÑONES
                                    REED M. BRODSKY
                                    DAVID B. MASSEY
                                    Assistant United States Attorneys
                                    Tel: 212-637-2487/2492/2283